# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

AARON SCOTT,

               Petitioner,      :      Case No. 3:12-cv-146

   - vs -                                 District Judge Walter Herbert Rice
                                             Magistrate Judge Michael R. Merz

TERRY TIBBELS, WARDEN,
  Mansfield Correctional Institution,

                                        :

               Respondent.

## SUPPLEMENTAL REPORT AND RECOMMENDATIONS

Petitioner Aaron Scott brought this habeas corpus action *pro se* under 28 U.S.C. § 2254 to seek release from his sentence of twenty-five years to life imprisonment upon his conviction in the Montgomery County Common Pleas Court for murder and aggravated robbery. After the pleadings were complete, the Magistrate Judge recommended dismissal with prejudice (the "Report," Doc. No. 25). Petitioner has objected (Doc. No. 27) and Judge Rice has recommitted the case for reconsideration in light of the Objections (Doc. No. 28).

**Ground One: Confrontation Clause**

In his First Ground for Relief, Scott asserts his Confrontation Clause rights were violated when the trial court refused to permit his counsel to cross-examine (1) the State's serology expert, Amy Rismiller, about "contamination of [DNA] samples for which she had been placed on probation" and (2) State's witness Lona Westbrook "about any plea deal she might have

1

entered into and/or whether she expected something in return when she made her statement to the police." (Petition, Doc. No. 1, PageID 34.) The Report noted that the Second District Court of Appeals had decided these claims on the merits and concluded that that court's decision was entitled to deference under 28 U.S.C. § 2254(d)(1) because it was not an objectively unreasonable application of clearly established Supreme Court law (Report, Doc. No. 25, PageID 5170).

Among these three restrictions on defense counsel, the court of appeals found two constitutional violations. The defense should have been permitted to cross-examine Ms. Rismiller about contamination of DNA samples in a prior case, even though she did not testify about the DNA in this case. *State v. Scott*, 2010 Ohio 1919, 2010 Ohio App. LEXIS 1576, ¶ 42 (2nd Dist. Apr. 30, 2010). And the defense should have been permitted to cross-examine Ms. Westbrook about her subjective expectation of any benefit in her pending drug cases from her testimony against Scott. *Id.* at ¶ 32. Because it had been established at a pretrial *in limine* hearing that there was no plea deal, there was, however, no good faith basis to cross-examine Westbrook on that issue and no Confrontation Clause violation in prohibiting the cross-examination. *Id.*

The court of appeals found the two violations harmless error because of the strength of the case against Scott, which it summarized as follows:

> [O]n the whole, the evidence against Scott was quite strong. His DNA and the victim's blood were found on a red t-shirt discarded in Scott's apartment complex. Scott claimed that he had left this t-shirt on his patio, where it could have been stolen, because it was moldy, but the DNA analyst testified that there was no mold on the t-shirt. Scott's saliva was also found on Stapleton's shirt. A knife that matched a set at Scott's apartment was found at the murder scene. Westbrook and her son testified that Scott came to their apartment around the time of the murder, breathless and sweaty, and asked for a new shirt. According to the son, Scott was also

>covered in blood. A short time later, when the police responded to the scene, Scott suddenly disappeared while walking in the apartment complex with Westbrook.

*Id.* at ¶ 43. The Report defers to the court of appeals harmless error finding.[1]

Scott makes a number of objections to the harmlessness finding. The Report notes that Rismiller did not testify about the DNA results in this case, so impeaching here about her problems with handling DNA in another case would not have impeached the DNA results in this case (Report, Doc. No. 25, PageID 5169-70). Scott objects that the trial court "certified . . . [her] as an expert in the fields of Forensic Science Serology and DNA." (Objections, Doc. No. 27, PageID 5193, quoting Trial Tr., Doc. No. 19-4, PageID 3853.) It is accurate that the trial court accepted Ms. Rismiller as an expert in serology and DNA on motion of the State and with no objection by defense. *Id.* However, she did not testify about DNA in this case, but only about the serology. She was subject to cross-examination about her handling of the physical evidence in this case, and Scott does not suggest any way in which her problems with DNA in another case would have been relevant (i.e., would have made it less likely that it was Scott's DNA which was found) in this case.

Scott also argues that the jury should have been allowed to hear what Ms. Westbrook would have said about her motivation to testify against Scott. He argues at some length about what her motivation would have been because of being under indictment at the time. However, he has no proof that she would have admitted a motivation to help the police in hope she would get a benefit with her pending case. The issue was thoroughly explored at the motion in limine hearing where Westbrook was examined under oath and denied any such motivation. She may not have been telling the truth, but there is no evidence she would not have given the same

---

[1] The Magistrate Judge also agrees with the finding and would so hold if review here were *de novo*.

testimony at trial. Scott would then have been stuck with her denial because, as the trial judge concluded, Scott's counsel knew "ahead of time you're not going to be able to disprove her denial from anybody else involved in the case." Quoted at ¶ 27 of the court of appeals' decision. While she certainly had reasons "not to disappoint the prosecutor's office" or to "curry favor with law enforcement," Judge Langer thoroughly explored at the motion in limine hearing whether there had been any communication with her by the police or the prosecutor about any expectation of favorable treatment and there was no testimony to support any such communication. (Objections, Doc. No. 27, PageID 5196) The most that Scott has is a hope that Westbrook would have changed her testimony from the in limine hearing and that hope is not enough to show that prohibiting the question was not harmless error.

The Report was cursory in noting the strength of the case against Scott aside from the Westbrook testimony (Report, Doc. No. 25, PageID 5169-70). The court of appeal summarized the evidence against Scott as follows:

> **[\*P2]** The State's evidence established the following facts:
>
> **[\*P3]** On the evening on May 21, 2004, Chad Stapleton and Greg Credlebaugh got together to watch a Reds game on television at Credlebaugh's apartment and at the Centerville Inn, where they drank beer until about 1:00 a.m. They then walked back to Credlebaugh's nearby apartment. Credlebaugh testified that Stapleton left the apartment at 1:10 or 1:15 a.m. and that Stapleton's drive home would have taken about twelve minutes.
>
> **[\*P4]** Stapleton lived with his girlfriend, Mara Jones, at the Barclay Square apartment complex in Moraine. In the early morning hours of May 22, 2004, Jones heard Stapleton screaming her name from the parking lot of the apartment complex. Jones went outside and saw Stapleton near the parking lot, being held with his back against a wall by a man with short brown hair and wearing a red t-shirt. Stapleton told her to call the police, which she did. The man in the red t-shirt ran across Lamme Road, and Stapleton collapsed to the ground.

**[\*P5]** Stapleton died a short time later. He had been stabbed several times, including a fatal wound to his chest. His wallet was not found on his body. In the nearby parking lot, the door to Stapleton's car door was open; blood was on Stapleton's car and a car parked next to it. Keys, a FILA baseball hat, a broken utility knife, money, and a pocket ripped from Stapleton's shirt were also found near his car.

**[\*P6]** Jones and a neighbor who witnessed some of the events in the parking lot described the person who had held Stapleton against the wall as a white male with very short hair, 5'9" or 5'10" tall, approximately 140 pounds, wearing a red t-shirt and jeans or dark shorts. The neighbor also saw the man drive by the complex as a passenger in a vehicle a short time later. After daybreak, a red shirt with blood on it was found on the ground at the Cobblegate Apartments, which are across Lamme Road from the Barclay Square Apartments.

**[\*P7]** In May 2004, Lona Westbrook lived in the Cobblegate Apartments. She had known Aaron Scott for four years at that time. According to Westbrook, Scott came to her apartment at 1:00 or 2:00 a.m. on May 22, 2004, sweating, breathing heavily, and talking fast. Scott claimed that someone had tried to beat him up, and he asked Westbrook to walk him home. He also asked for a new shirt. Westbrook agreed to walk Scott home but, while they were walking, he disappeared shortly after they saw police cruisers nearby. Westbrook did not know where Scott had gone. After he disappeared, Westbrook continued to Scott's apartment, angry that he had awoken her. Scott's roommate and partner, John Jackson, Jr., was at the apartment, but Scott was not.

**[\*P8]** Westbrook heard about the homicide the next morning, but she did not talk to the police until seventeen months later when a police officer knocked on her door to ask about it. She said that Scott did not fit the initial description that she heard of the suspect. When Westbrook initially talked to the police, she stated that Scott had been covered in blood when he came to her apartment, but at trial she testified that he had not been covered in blood. Westbrook's adult son, who was also present at the apartment in the early morning hours of May 22, 2004, testified that Scott had been "seriously covered in blood."

**[\*P9]** The autopsy revealed that Stapleton had suffered four knife wounds. The wound to his chest cut an artery and caused his death; the other wounds were superficial. Stapleton also had a bite mark

5

on his chest. An odontologist testified that, based on Scott's dental molds, there was a "high degree of probability" that Scott had inflicted the bite mark on Stapleton's chest. A DNA expert also testified that the saliva on the shirt that Stapleton had been wearing when he was stabbed and the pocket ripped off of that shirt matched Scott. Additionally, the FILA hat found near Stapleton's car contained Scott's DNA.

**[\*P10]** The red t-shirt found in the Cobblegate apartment complex contained DNA from three sources. Stapleton's blood was present in multiple places, and one spot contained a mixture of Stapleton's blood and Scott's saliva. "Wearer DNA" was also found on the t-shirt's collar and underarms. The wearer DNA on the collar matched Scott, and the DNA found in the underarm area matched both Scott and his roommate, Jackson. There was no mold on the red t-shirt or the hat. Semen was found on the inside and outside of Stapleton's underwear, but it was not tested. [1]

| Footnotes |
|---|
| [1] Credlebaugh testified that Stapleton had been at a "gentleman's club" before coming to Credlebaugh's apartment on May 21. |

**[\*P11]** The broken utility knife found near Stapleton's car was made by Robinson Products. A witness who worked at Robinson and was familiar with its products testified that the broken utility knife was only sold in a three-knife set, with a chefs knife and a slicer knife. The State presented evidence that two other knives that, with the utility knife, would complete the set, were found at Scott's apartment.

*State v. Scott, supra*, ¶¶ 2-11. In other words, the State's case depended on a great deal more than Westbrook's testimony.

Having reconsidered the matter in light of the Objections, the Magistrate Judge again concludes the harmlessness decision of the Second District is not an objectively unreasonable application of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and is therefore entitled to deference.

**Ground Two: Purported Omission of an Element from the Indictment**

In his Second Ground for Relief, Scott complains that adding the element of "recklessness" to his indictment during trial deprived him of due process. As explained in the Report, the amendment was apparently prompted by the Ohio Supreme Court's decision of *State v. Colon,* 118 Ohio St. 3d 26 (2008) during the course of Scott's trial. The addition was superfluous because the variety of aggravated robbery Scott was charged with committing (use of a deadly weapon) does not require proof of recklessness or any other *mens rea* element; it is a strict liability crime. Compare Ohio Revised Code § 2911.01(A)(2)(serious physical harm) with Ohio Revised Code § 2911.01(A)(1)(deadly weapon).

The Report also noted that Scott's claim about grand jury indictment (i.e., that the grand jury did not include the recklessness element) was not cognizable in habeas corpus because the Fifth Amendment grand jury right is not applicable to the States. (Report, Doc. No. 25, PageID 5176), *citing Hurtado v. California*, 110 U.S. 516 (1884); *Branzburg v. Hayes,* 408 U.S. 665, 687-88 n. 25 (1972); and *Gerstein v. Pugh,* 420 U.S. 103 (1975). Finally, the report found that Scott had received fair notice of the charge against which he had to defend: robbery at knifepoint.

In his Objections, Scott says the key question is whether addition of the "recklessness" term prejudiced him (Objections, Doc. No. 27, PageID 5199). That is true, but Scott has offered no argument about how it could possibly have prejudiced him. Adding the element **increased** the burden of proof on the State and hence aided Scott.

It is again respectfully recommended that Ground Two be dismissed with prejudice.

**Ground Three:  Lack of Proof of the Chain of Custody**

In his Third Ground for Relief, Scott asserts he was denied a fair trial when the State was not required to prove the chain of custody for some of the physical evidence.  The Report recommended rejecting this claim for two reasons (1) it was not raised on direct appeal and was therefore procedurally defaulted and (2) there is no federal constitutional right to insist on proof of the chain of custody (Report, Doc. 25, PageID 5179).

In his Objections, Scott asserts his real complaint is that the court of appeals denied him due process when they refused to reopen his direct appeal to hear this claim.  He essentially concedes that the first time he presented this claim was in his 26(B) application to reopen.

The court of appeals denied the 26(B) application in a ten-page opinion.  *State v. Scott,* Case No. 22745 (Ohio App.2nd Dist. Jan. 26, 2011)(unpublished, copy at Doc. No. 19-1, PageID 2918-27.)  In the course of that opinion, the Second District refuted Scott's claim that his appellate attorney had not made a genuine attempt to raise problems with the crime lab testimony.  It also held that "some of the documents on which he relies were not part of the trial court record.  As such, they cannot form the basis of a reversal on direct appeal." *Id.* at PageID 2921.

Scott argues this is a misstatement of Ohio law:

> In Ohio, any documents and materials that existed at the time of trial, and was [sic] available to trial counsel, is not evidence de hors the trial record and cannot be presented in a post conviction petition. See *State v. Schrock* (App. 11th Dist.) 2008 WL 2875690 at ¶ 22; *State v. Kenney* (App 8th Dist.), 2003 Ohio 2046 at ¶ 45; *State v. Hovart* (App. 7th Dist.), 2009 Ohio 7805 at ¶ 15.

(Objections, Doc. No. 27, PageID 5199.)  Based on this case law, Scott argues,

8

> the appellate court had no reason not to review and consider the petitioner's exhibits attached to his App. R. 26(B) application because they are apart [sic] of the original trial record accoridng to Ohio's own case law and by not relying on them to make their decision violates petitioner's right to due process.

*Id.* Scott asserts the exhibits would prove Amy Rismiller "contaminated evidence during the same frame of time that the evidence in petitioner's case was being processed.. . ." *Id.*

*State v. Schrock,* 2008 Ohio 3745, 2008 WL 2875690 (Ohio App. 11th Dist. 2008), does not stand for the proposition for which Scott cites it. In *Schrock* the defendant was found guilty in 1989 of multiple counts of rape, kidnapping, and gross sexual imposition. In September, 2007, he filed a second petition for post-conviction relief, attaching an August 25, 1988, letter from an examining physician showing intact hymenal rings and lack of genital trauma. Because the letter had existed and been in defense counsel's possession at the time of trial, the Common Pleas court dismissed the petition, concluding, because he actually had the letter, defendant had not been "unavoidably prevented from discovering" it. The court of appeals affirmed. Nothing in the opinion suggests new evidence not previously entered into the trial record can be admitted at the court of appeals level. The language on which Scott relies holds that evidence submitted in support of a post-conviction petition under Ohio Revised Code § 2953.21 must be "competent, relevant and material evidence outside the trial court's record, **and** it must not be evidence that existed or was available at the time of trial*." Schrock, supra*, at ¶ 11, *citing State v. Lesure,* 2007 Ohio 4381 (Ohio App. 11th Dist. 2007) at ¶ 39. The court writes in the conjunctive: the evidence must be both outside the trial record and have been unavailable at the time of trial. And the *Schrock* court speaks to evidence in support of a post-conviction petition. Nothing it says suggests that evidence which does not meet both of those criteria somehow becomes admissible at the court of appeals level.

9

*State v. Kenney,* 2003 Ohio 2046, 2003 Ohio App. LEXIS 1933 (Ohio App. 8th Dist. 2003), is to the same effect as *Schrock*. The court held that evidence which existed and was available at the time of trial would not support a petition for post-conviction relief. The court said nothing about introducing the evidence at the appellate level. Finally, the Magistrate Judge is unable to find any report of the decision cited by Scott as *State v. Hovart*, 2009 Ohio 7804 (Ohio App. 7th Dist. 2009).

In sum, Scott has produced no law supporting admission of evidence in the Ohio court of appeals on a Rule 26(B) application, much less any constitutional command under the Due Process Clause requiring such admission. Nor has he submitted any Supreme Court law requiring proof of the chain of custody as a matter of due process.

Scott's Third Ground for Relief should be dismissed with prejudice.

**Ground Four: Ineffective Assistance of Trial Counsel**

In his Fourth Ground for Relief, Scott asserts his trial attorney provided constitutionally ineffective assistance in four respects (Petition, Doc. No. 2, PageID 39-41). As the Report notes, none of the four sub-claims was raised in a petition for post-conviction relief; Scott has never filed such a petition. Instead, the claims were first raised in Scott's App. R. 26(B) application for reopening.

The Report concluded that any portion of this claim which depended on evidence outside the trial court record was procedurally defaulted by failure to present it in a post-conviction petition. Scott relies in his Objections (Doc. No. 27, PageID 5200) on the same cases he cited under Ground Three for the proposition that he could not have relied on this material in a post-

conviction petition and therefore the court of appeals was constitutionally obliged to consider it. For reasons given under Ground Three, the cited case law does not support that proposition.

Scott's second objection is that the state court of appeals reached the merits of this claim and therefore this Court should as well (Objections, Doc. No. 27, PageID 5200). What the court of appeals decided was "Scott's Application for Reopening does not raise any colorable claims of ineffective assistance of appellate counsel. . . ." *State v. Scott,* Case No. 22745 (Ohio App. 2nd Dist. Jan. 26, 2011)(unpublished, copy at Doc. No. 19-1, PageID 2927.) Scott submitted no "assignments of error or distinct arguments, as required by App. R. 26(B)(2)(c). *Id.* at PageID 2919. The court then grouped Scott's arguments under several headings, but made clear it was evaluating ineffective assistance of appellate counsel claims, not ineffective assistance of trial counsel claims. Regarding the DNA testing claim, it found appellate counsel had argued the issue. *Id.* at PageID 2920-21. At the very end of that section, it noted that "some of the documents on which he relies were not part of the trial court record. As such they cannot form the basis of a reversal on direct appeal." *Id.* at 2921. That is a summary way of holding that appellate counsel could not have raised claims based on those documents on direct appeal and it was not ineffective assistance of appellate counsel to fail to do so.

In a section labeled "prosecutorial misconduct," the court of appeals discusses claims about the prosecutor coaching Amy Rismiller. Scott had claimed that the coaching occurred prior to or during the trial. *Id.* at PageID 2922. Of course, to the extent he had evidence of such coaching which was not part of the trial record, it could not have been raised on direct appeal. Thus the Report found any such claim, to the extent it relief on evidence outside the record, would have had to be presented in a post-conviction petition, which Scott never filed. The court of appeals did not discuss this question, but focused on the evidence which was in the record and

11

found it would not have supported a colorable assignment of error and was therefore not ineffective assistance of appellate counsel to fail to raise. *Id.* at PageID 2923. There is no discussion here of the merits of an ineffective assistance of trial counsel claim, only the ineffective assistance of appellate counsel claim.

In a section labeled "improper charging of predicate offense," the court of appeals finds there was no error in the way this was done and therefore no colorable assignment of error on appeal. *Id.* at PageID 2923-24. Again, there is no discussion of the merits of any possible ineffective assistance of trial counsel claim.

In a section labeled "fingerprint evidence," the court of appeals notes three claims about trial counsel's conduct which presumably were intended to support a claim of ineffective assistance of appellate counsel for failure to raise ineffective assistance of trial counsel as an assignment of error. *Id.* at PageID 2924-25. The court of appeals found, contrary to Scott's claim, that "[t]he record demonstrates that trial counsel did question the lead detective about the fingerprints found (and not found) on the victim's vehicle." *Id.* It makes no comment on the absence of argument by trial counsel about the absence of fingerprints on the knife. Overall, it concluded there was no ineffective assistance of appellate counsel in failure to argue ineffective assistance of trial counsel about the fingerprint evidence.

Scott is correct that the fingerprint evidence section of the court of appeals' opinion can be read as discussing the merits of a possible ineffective assistance of trial counsel claim by way of finding there would have been no appellate success in raising such a claim. Inferentially, that amounts to a holding that appellate counsels' performance was not deficient in dialing to raise this assignment of error. This is not a "no prejudice" holding under the second prong of *Strickland v. Washington,* 466 U.S. 668 (1984), but a "no deficient performance" holding under

12

the first prong of *Strickland*.

In his Objections, Scott cites Sixth Circuit law which he says establishes that under the circumstances presented here, there is no procedural default of the ineffective assistance of trial counsel claims.  (Objections, Doc. No. 27, PageID 5201), *citing Patterson v. Haskins*, 316 F.3d 596 (6th Cir. 2003); *James v. Brigano,* 470 F.3d 636 (6th Cir. 2006); and *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007).  *Haliym* holds that the federal courts will look to the last explained state court decision on an issue to determine whether the decision was on the merits or not.  In *Haliym* as in this case, the court of appeals reached the merits of the ineffective assistance of appellate counsel claim.  In *James*, the Sixth Circuit held that district courts are required by circuit precedent (*Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001)) "to examine precisely what the court of appeals did, in accordance with the *Maupin* test [for procedural default]."  470 F.3d at 641.  Here the court of appeals ruled on the merits of the ineffective assistance of appellate counsel claim; it did not find that claim procedurally defaulted.  But in deciding that claim on the merits, it decided there was no deficient performance by appellate counsel.  Finally, in *Patterson*, the Sixth Circuit found that the state court of appeals had not rejected a claim of ineffective assistance of appellate counsel on procedural grounds, but had decided the proposed assignment of error on the merits.  316 F.3d at 605.  In this case the court of appeals also reached the merits of the ineffective assistance of appellate counsel claim, not the ineffective assistance of trial counsel claims.  Scott's Fourth Ground for Relief does not claim ineffective assistance of appellate counsel, which is the claim he preserved by filing the 26(B) application, but ineffective assistance of trial counsel.

**Ground Five:  Denial of a Fair Trial**

In his Fifth Ground for Relief, Scott complains that the trial judge abused his discretion by allowing Amy Rismiller to testify at all and then by not allowing defense counsel to cross-examine her about prior contamination of evidence incidents. He also complains of admission in evidence of photograph no. 72 which he says is a red t-shirt which is highly suggestive and very prejudicial (Petition, Doc. No. 2, PageID 41).

The Report concluded that all constitutional issues relating to Rismiller's testimony had been dealt with under Ground One and that Scott had not shown any constitutional violation in admission of the red t-shirt or the photograph of it (Photograph No. 72)(Report, Doc. No. 25, PageID 5182-83).

Scott objects that his claim about Rismiller in this Ground for Relief is a due process claim, whereas the claim in Ground One is a Confrontation Clause claim (Objections, Doc. No. 27, PageID 5201-02).  However, he cites no Supreme Court law suggesting a different constitutional standard.

As to the red t-shirt, Scott claims that Westbrook testified that when he came to her apartment the night of the murder "he was completely clothed and she did not see any blood on him." (Objections, Doc. No. 27, PageID 5202, *citing* Trial Tr. at PageID 3824.)  At that point in the testimony, Ms. Wesbrook was being cross-examined and could not say what Scott was wearing, but she remembered that he was "clothed."  *Id.* Asked if she saw any blood, she responded that "I seen a glistening from the glare of the TV.  I didn't see blood.  I didn't see what I thought was blood."  *Id.*  She did remember that he asked for a shirt more than once.  *Id.* at PageID 3827.  This was the same testimony she had given on direct.  *Id.* at PageID 3799-3800. Therefore the finding of the court of appeals that "Scott came to [Westbrook's] apartment on the

14

night of the murder and asked for a new shirt" is completely supported by the record. Westbrook did not testify that there was no blood on Scott, but that she did not see any blood on him in the dim light coming from her TV at 2:00 in the morning.

Scott also believes that because he testified the red t-shirt in question was his but discarded on the patio because it had mold on it that that testimony is somehow conclusive and the t-shirt could therefore not be admitted. But the State produced evidence that there was no mold on the shirt, the victim's blood and Scott's DNA were found on the shirt, and that it was found in the vicinity of the murder, in connection with Westbrook's testimony that Scott asked her "more than once" for a new shirt on this occasion is more than enough foundation for admission of the shirt and the photograph.

Scott does not identify any constitutional principle which would make the shirt inadmissible. It is relevant evidence, given the testimony recited above. To put it another way, it is possible that the murderer, some unknown third person, had a shirt with Scott's DNA and the victim's blood on it and discarded it in the patio just about the time the victim was murdered and Scott, perspiring and breathing heavily, asked Westbrook for a new shirt, but it is not very likely. Indeed, the t-shirt is strong physical evidence of Scott's guilt, but that does not make its admission "prejudicial."

**Ground Six: Ineffective Assistance of Appellate Counsel**

In his Sixth Ground for Relief, Scott claims his appellate counsel was ineffective for failing to raise on direct appeal the claims Scott pled in his App. R. 26(B) application. Scott received an explained decision on the merits of this claim which are reviewed above under

15

Ground Four.

The Report concluded that the court of appeals' decision on this Ground for Relief was not an objectively unreasonable application of relevant Supreme Court precedent, particularly *Strickland v. Washington, supra*. The Objections merely recite the standard for ineffective assistance of appellate counsel and do not make any claims which are not dealt with in the Report. No further analysis is needed.

**Conclusion**

Having reconsidered the case in light of the Objections, the Magistrate Judge again recommends the Petition be dismissed with prejudice. Because the Second District Court of Appeals found constitutional error on the Confrontation Clause claims, Scott should be granted a certificate of appealability on the question whether that error was harmless. Because reasonable jurists would not disagree with the other conclusions in the Report or this Supplemental Report, the certificate of appealability should be limited to the First Ground for Relief. Petitioner should be permitted to proceed *in forma pauperis* on appeal.

August 29, 2013.

s/ *Michael R. Merz*<br>United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).