IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AARON SCOTT,

      Petitioner,

  v.

WARDEN, MANSFIELD
CORRECTIONAL INSTITUTION,

      Respondent.

:

:

:

:

Case No. 3:12-cv-146


DISTRICT JUDGE WALTER H. RICE


MAGISTRATE JUDGE MICHAEL R. MERZ

---

DECISION AND ENTRY DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS OF PETITIONER AARON SCOTT (DOC. #2);
ADOPTING THE REPORT AND RECOMMENDATIONS (DOC. #25)
AND THE SUPPLEMENTAL REPORT AND RECOMMENDATIONS
(DOC. #29) OF THE MAGISTRATE JUDGE; OVERRULING
PLAINTIFF'S OBJECTIONS TO SAID JUDICIAL FILINGS (DOC. #27
AND DOC. #31); AND GRANTING A CERTIFICATE OF
APPEALABILITY ON GROUND ONE OF THE PETITION, BUT DENYING
A CERTIFICATE OF APPEALABILITY ON ALL OTHER GROUNDS;
JUDGMENT TO ENTER ACCORDINGLY; TERMINATION ENTRY.

---

      Pending before the Court is the Petition for Writ of Habeas Corpus (Doc.

#2), filed on May 21, 2012, by Aaron Scott ("Petitioner" or "Scott").  Scott's

petition challenges his confinement by the State of Ohio after his trial and

conviction for the May 22, 2004, murder and aggravated robbery of Chad

Stapleton.  Also pending before the Court are the Report and Recommendations

("R&R") of the Magistrate Judge (Doc. #25), Scott's Objections thereto (Doc.

1

#27), the Magistrate Judge's Supplemental R&R (Doc. #29), and Scott's Objections to that Supplemental filing (Doc. #31).

Based upon the reasoning and citations set forth in both the R&R and the Supplemental R&R of the United States Magistrate Judge, as well as upon a thorough *de novo* review of this Court's file and the applicable law, this Court ADOPTS the recommendations of said judicial filings in their entirety and OVERRULES Scott's Objections (Doc. #27 & 31) to both reports.  Accordingly, Scott's Petitioner for a Writ of Habeas Corpus (Doc. #2) is DENIED.

Given that Petitioner has not made a substantial showing of the denial of a constitutional right on Grounds Two, Three, Four, Five or Six of the Petition, and, further, that the Court's decision thereon would not be debatable among reasonable jurists, and because any appeal from this Court's decision would be objectively frivolous, Petitioner is DENIED a certificate of appealability and DENIED any anticipated motion for leave to appeal *in forma pauperis* on Grounds Two through Six.

However, for the reasons set forth below, the Court GRANTS Scott a certificate of appealability on Ground One of the Petition, in which Scott argues that the violation of his rights under the Confrontation Clause of the Sixth Amendment and the Due Process Clause under the Fourteenth Amendment had a substantial and injurious effect on the jury's verdict.

## I.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

Ground One of Scott's petition argues that a series of rulings that constrained his cross-examination of two witnesses during his state court trial infringed his rights guaranteed by the Confrontation Clause, and resulted in a due process violation under the Fifth and Fourteenth Amendments.  Doc. #2 at 4, 11-14.  First, Scott wanted to ask witness Lona Westbrook about a plea deal that he suspected her of entering into, for charges she faced in an unrelated case, in exchange for providing testimony and information against him.  At the time of his trial, Scott believed that such a plea deal existed.  Scott also hypothesized that Westbrook believed that she might receive such a deal at the time she was questioned about his (Scott's) activities on the night of Stapleton's murder.  After conducting a hearing and concluding that no one ever offered her a deal in exchange for testifying against Scott, the trial court refused to allow any questioning of Westbrook on the topic of the suspected plea deal, even precluding any question on whether she subjectively believed she might receive such a plea deal at that time.  According to Scott, the trial court's ruling thwarted his plan to impeach Westbrook based on motive or bias, or otherwise attack her credibility on cross-examination.

3

Scott specifically invoked the Sixth Amendment and his rights under the Confrontation Clause when he appealed the trial court's rulings.[1]  *Ohio v. Scott*, No. 22745, 2010-Ohio-1919 ¶ 21 (Ohio Ct. App. 2010).  The Second District Court of Appeals held that the trial court erred under the Ohio Rules of Evidence when it did not allow Scott to question Westbrook about whether, at the time she began cooperating with authorities, she subjectively expected a plea deal in return for her cooperation.  *Id*.  Ohio's Rules of Evidence allow a defendant to impeach a witness by showing "bias, prejudice, interest, or any motive to misrepresent," as well as through cross-examination "on all relevant matters and matters affecting credibility," as long as there is a reasonable, good-faith basis for the questioning.  *Id.*; Ohio R. Evid. 607(B), 611(B), 616(A).  The pre-trial hearing demonstrated to the satisfaction of the trial court judge that no plea deal between Westbrook and the authorities existed, so there was no good-faith basis to ask Westbrook whether such a deal existed.  2010-Ohio-1919 ¶ 32.  The Court of Appeals held that the trial court did not, therefore, err by ruling that Scott could not ask Westbrook whether such a plea deal existed.  *Id.*  However, because Westbrook talked to law enforcement while charges against her were pending, a good-faith basis existed for asking Westbrook if she had subjectively believed that a plea deal might result from her cooperation.  *Id.*  Thus, the Court of Appeals held that it was error for the

---

[1] The Sixth Amendment to the United States Constitution guarantees the right of an accused to confront all witnesses during a criminal proceeding, and is applicable to the States through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 403 (1965).  Scott's argument on appeal invoked the Sixth and Fourteenth Amendments.  2010-Ohio 1919 ¶ 21.

4

trial court not to allow Scott to attempt to impeach Westbrook by showing that her subjective expectation of a plea deal had motivated her initial willingness to assist the police. *Id.*

Second, the trial court prevented Scott from questioning the State's expert witness, Amy Rismiller, about DNA samples unrelated to Scott's case that she had contaminated, and her disciplinary record for the contamination. *Id.* ¶ 41. Rismiller did not perform DNA analysis on the evidence introduced against Scott. *Id.* Rather, she "testified about the collection of blood, saliva, and sweat from items found at or near the crime scene and from the victim's clothing," as a "serology expert" for the State. *Id.* The trial court ruled that because Rismiller was not called as a DNA expert against Scott, her discipline for DNA contamination was not relevant to her testimony as a serologist. *Id.*

The Ohio Court of Appeals held that this exclusion was also error:

> In our view, the defense, in an attempt to impeach an expert opinion, should have been permitted to cross-examine Rismiller about any documented issues concerning her handling of specimens, even if her specific role in the prior case were different from the her role in Scott's case (*i.e., the collection v. the analysis of DNA evidence*). The State certainly could have, if necessary, rehabilitated Rismiller on re-direct examination by showing that the alleged previous errors were unrelated to the collecting, testing, and opinion in this case. Thus, the trial court erred in preventing the defense from pursuing this line of cross-examination.

*Id.* ¶ 42 (emphasis in original).

5

In spite of the trial court's errors, the Ohio Court of Appeals ultimately held that they were "harmless beyond a reasonable doubt," based on the strength of the other evidence against Scott. *Id.* ¶ 43.

In his first R&R, the Magistrate Judge agreed that the trial court erred in its evidentiary rulings, but believed "the impeachment would have been weak at best." Doc. #25 at 9. He pointed out that "Rismiller was not called as an expert witness on the DNA evidence, so impeaching her with her prior errors regarding DNA evidence would not [have] significantly impeached the DNA evidence presented." *Id.* at 8-9. The Magistrate Judge agreed with the Court of Appeals that "[t]here was a great deal of physical evidence linking Scott to the murder," and concluded, therefore, that it did not unreasonably apply clearly established federal law. Doc. #25 at 8-9.

Scott made several objections to the Magistrate Judge's conclusion. He pointed out that the trial court certified Rismiller as an expert in *both* serology and DNA, leading him to believe that the jury would have given more weight to the evidence of contamination than the Magistrate Judge suggests. Doc. #27 at 3-4. Scott also believed that the jury should have been able to decide whether the impeachment case against Westbrook was "weak," and outlined a series of facts surrounding her own criminal charges that he believed clearly show Westbrook had a motive to "curry favor" with the State. *Id.* at 4-6.

In the Supplemental R&R, the Magistrate addressed Scott's objections by stating that although Rismiller was certified as an expert in serology and DNA, she

did not testify about DNA in Scott's case, and was subject to cross-examination on her handling of the evidence she collected.  Doc. #29 at 3.  Furthermore, the Magistrate Judge pointed out that "Scott does not suggest any way in which her problems with DNA in another case would have been relevant (i.e., would have made it less likely that it was Scott's DNA which was found) in this case."  *Id.*

Regarding Westbrook's testimony, the Magistrate Judge pointed out that the issues that Scott raised were fully explored during the pre-trial hearing, and there was no indication that Westbrook would have suddenly admitted that she had the motive Scott ascribes to her if he had been allowed to cross-examine her in the manner that he wished.  *Id*. at 3-4.  Finally, the Magistrate Judge provided a lengthier recitation of the evidence against Scott than appeared in the original R&R, and noted that the case against him "depended on a great deal more than Westbrook's testimony."  *Id.* at 4-6.  In the Supplemental R&R, the Magistrate Judge again concluded that the Ohio Court of Appeal's harmlessness determination was entitled to deference.  *Id.* at 6.

In his Objections to the Supplemental R&R, Scott made three arguments against the Magistrate Judge's analysis of the controversy surrounding Rismiller's testimony.  Doc. #31.  First, Scott again stated that the trial court's certification of Rismiller as both a serologist and a DNA expert justified allowing him to question her about her previous DNA contamination.  *Id.* at 3.  Second, Scott pointed to statements by the trial court judge that issues regarding Rismiller's contamination did not challenge her expertise, but concerned the "preserving and handling of

evidence," and were therefore relevant to her preservation and handling of the evidence that was DNA tested in Scott's case. *Id.* at 4. He believed that the fact that Rismiller's superiors reviewed her work over a two-year period, during which time she performed work on the evidence used at Scott's trial, shows how "serious" the matter was, and that the prosecution exploited his inability to impeach Rismiller by pointing out to the jury that they "heard nothing of any contamination in this case." *Id.* at 6-7. <u>Third</u>, Scott objected that the State was able to obtain several evidentiary rulings in its favor based on a document (the lab's internal memorandum regarding Rismiller's DNA contamination) that it provided to Scott during discovery.[2] *Id.* at 8.

---

[2] The Court addresses the merits of Scott's first two objections in Section II.B of its analysis. With regards to the third objection, Scott appears to argue that the evidence of Rismiller's DNA contamination should not have been excluded simply because the State disclosed the crime lab memorandum to him during discovery: "The State cannot provide these document[s] through discovery, not file a motion in limine to prevent the evidence from being disclosed at trial, and yet argue to the trial court that the defense should not be allowed to use the documents to question Ms. Rismiller's credibility." Doc. #31 at 8. Under Ohio law, the trial court determines the admissibility of evidence. *See*, *e.g.*, Ohio Evid. R. 103; *see also State v. Haines*, 860 N.E.2d 91, 101 (Ohio 2006) ("The admission or exclusion of relevant evidence rests within the sound discretion of the trial court"). Barring exceptional circumstances, such as spoliation in a civil trial, a party's conduct does not determine the admissibility of evidence. *E.g.*, *Loukinas v. Roto-Rooter Servs. Co.*, 855 N.E.2d 1272, 1278 (Ohio Ct. App. 2006) (upholding exclusion of expert testimony as a spoliation sanction plaintiff intentionally allowed plumber to excavate before defendant could examine drain line). The State has an obligation to disclose evidence "material to the preparation of a defense" under Ohio Crim. R. 16(B), and it is illogical to suggest that the State forfeited its right to object simply because it was the original source of that evidence. Moreover, both prosecutors expressed surprised when Scott's attorney began questioning Rismiller about DNA contamination and stated that they were unfamiliar with the

Scott also took issue with the Magistrate Judge's conclusion that the State's evidence against him was strong apart from Westbrook's testimony, because the State was unable to obtain a grand jury indictment against him before she cooperated with her testimony. *Id.* at 8-12. He also points out that, regardless of whether Westbrook would have given the same answers at his trial that she gave at the pre-trial hearing, it was the issue of her motivation to testify that he should have been allowed to put before the jury. *Id.* at 13.

## II.   STANDARD OF REVIEW AND APPLICABLE LAW

The Confrontation Clause of the Sixth Amendment states that "the accused shall enjoy the right . . . to be confronted with the witnesses against him" in any criminal proceeding. U.S. Const. amend. VI.   The right to be confronted with witnesses secured by the Confrontation Clause includes the right to cross-examine those witnesses. *Pointer v. Texas*, 380 U.S. 400, 404 (1965). The right of cross-examination "is not absolute," *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973), as "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Nevertheless, the

---

memorandum.  Doc. #16-4 at 217, PageID #3896.  They could not, therefore, have filed a motion in limine to prevent its disclosure.

9

"denial or significant diminution" of a defendant's right of cross-examination "calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined." *Chambers*, 410 U.S. at 295 (quoting *Berger v. California*, 393 U.S. 314, 315 (1969)). Thus, "[t]he rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Id.* at 294.

The Supreme Court has repeatedly "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316-18 (1974) (citing *Greene v. McElroy*, 360 U.S. 474 (1959) (holding that a defendant's confrontation rights were violated when a state rule protecting juveniles prohibited him from asking a witness about his probationary status and possible involvement in the crime, which may have exposed "undue pressure" based on the "vulnerable status" of the witness). *See also Chambers v. Mississippi*, 410 U.S. 284 (1973) (holding that the cumulative effect of the trial court's rulings applying state evidentiary rules prevented the defendant from having a fair opportunity to defend himself from the state's charge that he had murdered a police officer, when the defendant was not allowed to impeach a witness who had given a sworn confession to the murder, retracted the confession, and confessed to three different people that he had shot the officer); *Rock v. Arkansas*, 483 U.S. 44 (1987) (holding that state's *per se* rule excluding all hypnotically refreshed testimony violates a defendant's right to testify on her

10

own behalf, as reliability may be established in individual cases, where defense depended on defendant's post-hypnosis testimony recalling exculpatory facts from the shooting that were corroborated an expert's testimony); *Holmes v. South Carolina*, 547 U.S. 319 (2006) (holding that defendant's due process right to present defense violated by "arbitrary" state rule that prohibits admission of evidence of third-party guilt if prosecution has introduced "strong evidence" of defendant's" guilt, as rule invites trial court judge to inappropriately weigh "the strength of the prosecution's case" to determine admissibility, no matter the probative quality of the evidence itself).

A state trial court's erroneous evidentiary ruling cannot justify federal habeas relief in the absence of a resulting constitutional violation. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (criticizing lower court's review of habeas petition that relied in part on the trial court's incorrect admission of evidence under state law, as "[s]uch an inquiry . . . is no part of a federal court's habeas review of a state conviction"). "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F. 3d 487, 494 (6th Cir. 2004) (citing *Estelle*, 502 U.S. at 69-70); *see also Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief"). "Generally, state-court evidentiary

11

rulings cannot rise to the level of due process violations unless they 'offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

Federal courts may not, however, perform *de novo* review of the evidentiary rulings made by state courts that form that basis for a habeas corpus petitioner's claim.  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires the application of a highly deferential, "stringent standard" of review to "any claim that was adjudicated on the merits in State court proceedings" that a habeas petitioner brings before a federal court.  28 U.S.C. § 2254(d); *Byrd v. Collins*, 209 F.3d 486, 538 (6th Cir. 2000).  Under this standard, a federal court may only grant the writ if the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1). A federal court may only perform a *de novo* review if the state court's decision failed to make a determination on the merits of the petitioner's constitutional claim. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (applying AEDPA deference only to first prong of state court's decision on habeas petitioner's ineffective assistance of counsel claim while reviewing second prong *de novo*, as "our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis"); *Hill v.*

12

*Mitchell*, 400 F.3d 306, 313-14 (6th Cir. 2005); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003).

The Sixth Circuit has also identified a "modified" form of AEDPA deference that applies "where the state court adjudicated the claim[,] but with little analysis on the substantive constitutional issue." *Vasquez v. Jones*, 496 F.3d 564 (6th Cir. 2007) (citing *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) and *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005)).  This "intermediate approach" requires the reviewing court to "conduct an independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Howard*, 405 F.3d at 467.  The review must be "careful," *Maldonado*, 416 F.3d at 476, but does not constitute "a full, *de novo* review of the claims." *Howard*, 405 F.3d at 467.  The review "remains deferential, because the court cannot grant relief unless the state court's result contradicts the strictures of AEDPA." *Id.* at 467-68.

In *Maldonado*, the petitioner argued that the erroneous admission of a witness's prejudicial comment violated "both Ohio evidence law and the Due Process Clause," but the state appellate court "appeared to decide the issue solely on the basis of state evidence law." *Maldonado*, 416 F.3d at 475.  Similarly, in *Vasquez*, the Sixth Circuit noted that "complexity arises here because although the state court adjudicated Vasquez's Confrontation Clause *claim,* it never addressed

13

the constitutional *issue*-instead, it simply held that any alleged error was harmless."  496 F.3d at 569; *see also Howard*, 405 F.3d at 467 (applying "modified" AEDPA standard to a situation in which "the state court disposes of a constitutional claim but fails to articulate its analysis").

Scott's first assignment of error expressly presented a constitutional claim to the Ohio Court of Appeals, arguing that the trial court's decision to limit the scope of cross-examination violated "his right to confront witnesses, his right to present a defense, his right to a fair trial, and to due process of law under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution."  2010-Ohio-1919 ¶ 21.  The Court of Appeals, however, only cited Ohio evidence law in its analysis of Scott's claim. *See* 2010-Ohio-1919 ¶¶ 21-44.  The court cited Ohio Evidence Rule 611(B), which allows cross-examination on "all relevant matters and matters affecting credibility," and a number of decisions of the Ohio Supreme Court for the proposition that "[a] cross examiner may ask a question if he or she has a good-faith belief that a factual predicate for the question exists." *Id.* ¶ 31 (citing *State v. Brinkley*, 824 N.E.2d 959 (Ohio 2005) and State v. McGuire, 533 N.E.2d 272 (Ohio 1988)).  It also cited Ohio Evidence Rule 616(A), which allows the impeachment of a witness by showing "bias, prejudice, interest, or any motive to misrepresent," and Ohio Evidence Rule 607(B), which requires an impeaching questioner to "have a reasonable basis for asking any question" asked. *Id.* The court applied these rules when it held that the trial court erred by not allowing

14

Scott to attempt to impeach Westbrook, whose initial willingness to assist the police may have been motivated by her subjective expectation of a plea deal, or Rismiller, the "serology expert" with a disciplinary record for contaminating DNA samples.  As in *Maldonado* and *Vasquez*, the court did not specifically address the constitutional claims in its application of state evidentiary law.  This suggests that the "modified" AEDPA standard set forth in those cases might apply to Scott's claim.

Since *Vasquez* and *Maldonado*, however, the Supreme Court has held that there is a rebuttable presumption that a petitioner's federal claim has been "adjudicated on the merits" by a state court, even if the decision does not expressly address the claim.  *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) (holding that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted"); *see also Ross v. Pineda*, 549 F. App'x 444, 448 (6th Cir. 2013) (citing *Johnson* and stating that the AEDPA's "heightened standard applies even if the state court hearing the petitioner's appeal or collateral challenge *does not* address the defendant's federal claims in affirming his conviction").  In this case, Scott has not presented any evidence to rebut the presumption that his federal claim was adjudicated on the merits by the Ohio Court of Appeals.

Furthermore, the presumption that the court reached the merits of Scott's federal claim is bolstered by an examination of the language it used, in the final

15

sentence of its analysis, to overrule Scott's first assignment of error. Ohio Courts

of Appeals must apply the harmless error standard of Rule 52 of the Ohio Rules of

Criminal Procedure, which states that "[a]ny error, defect, irregularity, or variance

which does not affect substantial rights shall be disregarded." According to the

Ohio Supreme Court, "[a] constitutional error can be held harmless if . . . it was

harmless beyond a reasonable doubt." *State v. Conway*, 842 N.E.2d 996 (Ohio

2006) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). The Supreme

Court has held that *Chapman*'s harmless-error analysis is the standard applicable to

direct review of a Confrontation Clause claim. *Delaware v. Van Arsdall,* 475 U.S.

673 (1986). The Ohio Court of Appeals, therefore, did invoke the appropriate

language under both federal and state law for analyzing the potential constitutional

*effect* of the trial court's erroneous evidentiary rulings when it concluded the

following: "Due to the strength of this evidence, the errors in limiting cross-

examination were harmless beyond a reasonable doubt, and Scott was not unfairly

prejudiced by the trial court's limitations on his cross-examination." 2010-Ohio-

1919 ¶ 43. This language, coupled with the rebuttable presumption that Scott's

federal claim was adjudicated on the merits by the Ohio Court of Appeals,

suggests that the AEDPA standard would apply to Scott's claim.

As deferential as the AEDPA standard is, however, the even more deferential

standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), actually applies

on habeas review to a state court's conclusion that only harmless error resulted

from a constitutional violation, as is the case with Scott's claim. *Fry v. Pliler*, 551

U.S. 112, 121-22 (2007); *see also Williams v. Bauman*, 759 F.3d 630, 637-38 (6th Cir. 2014) (explaining that the *Brecht* "standard is even more difficult for a § 2254 petitioner to meet than a requirement that the petitioner demonstrate that the state court's determination of harmless constitutional error was itself unreasonable"). Thus, a court does not review the harmlessness determination of the state appellate court under the lens of the AEDPA. *Id.* at 119-20; *see also Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009) (explaining that although "the interplay of *Brecht* and the AEDPA is not always straightforward," when reviewing a state court's harmless error determination, "*Brecht* is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied *Chapman* under the AEDPA and, further, whether the constitutional error had a 'substantial and injurious' effect on the jury's verdict"). Under *Brecht*, the question is whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007).

When applying *Brecht*, a particular rule "governs the special circumstance in which record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). "Grave doubt" is defined as when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* If grave doubt results from a court's application of *Brecht* to a

17

habeas claim, "the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *Id. See also Jensen v. Romanowski*, 590 F.3d 373, 583 (6th Cir. 2009) (affirming district court's grant of writ of habeas corpus to petitioner convicted of home invasion and criminal sexual conduct based on admission of hearsay statements by prior sexual assault victim to state trooper, as admission caused "'grave doubt' that the error was harmless"); *Stallings v. Bobby*, 464 F.3d 576, 583 (6th Cir.2006) (reversing the district court's denial of a writ of habeas corpus to petitioner convicted of drug possession where court was "left with 'grave doubt' as to the harmlessness of the error" of admitting the hearsay testimony of a non-testifying witness).

To determine whether a Confrontation Clause violation had a substantial and injurious effect on the jury's verdict, a court must examine all of the factors set forth in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). *See Williams*, 759 F.3d at 638 (applying the *Van Arsdall* factors to the question of "whether a Confrontation Clause violation was prejudicial" under *Brecht*). Those factors include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684. The ultimate question is whether, "assuming the damaging effect of the cross-examination were

18

fully realized," and considering the aforementioned factors, the cross-examination would have had a substantial and injurious effect on the jury's verdict. *Van Arsdall*, 475 U.S. at 684; *Brecht*, 507 U.S. at 623.  The Court will apply the first four *Van Arsdall* factors to the testimony of Westbrook and Rismiller in turn, before finally considering the fifth factor, the overall strength of the prosecution's case.

### A.    Testimony of Lona Westbrook

First, Lona Westbrook's testimony of was of central importance to the prosecution's case.  She testified that Scott showed up at her apartment at 1:00 or 2:00 in the morning, which corresponded to the time of Chad Stapleton's murder.  According to Westbrook, Scott was "perspiring . . . breathing, talking rapidly," said that someone had tried to beat him up, asked her for a shirt, and asked her to walk him home.  Doc. #19-4 at 120, PageID #3799.  As they left the apartment, there were emergency vehicles and police cruisers at or going towards the apartment complex across the street where Chad Stapleton had been stabbed. *Id.* at 124-25, PageID #3803-04.  After the police cruisers appeared, Westbrook testified that Scott disappeared as they were walking. *Id.*  This angered Westbrook, so she went to Scott's apartment to confront him. *Id.* at 127-28, PageID #3806-07.  She testified that his roommate, John Jackson, answered the door and stated that Scott was not there. *Id.*  Even though she heard about the murder the next day, she did not immediately go to the police because they described the suspect as a white man. *Id.* at 133, PageID #3812.  Westbrook's

19

testimony was important because it provided evidence of Scott's whereabouts and his physical state contemporaneous with the crime.  It was also important because her statement that Scott "disappeared" upon seeing the police cruisers could be seen as inferential evidence of consciousness of guilt.

Second, Westbrook's testimony was only partially cumulative of the testimony of her son, Leroy Shipp, who lived with her at the time.  Shipp testified that he opened the door when Scott rang the outside buzzer and then knocked on the front door.  Doc. #19-5 at 23, PageID #3951.  According to Shipp, Scott was "seriously covered in blood" and was "breathing hard like he was running." *Id.* at 24, PageID #3952.  Shipp went back to sleep after opening the door. *Id.* at 25, PageID #3953.  Thus, it was only Westbrook who could testify that Scott had disappeared when they noticed the police cruisers on the walk home, and that he was not at his apartment immediately afterwards.

Third, Shipp's testimony also corroborated Westbrook's testimony on several key points, including Scott's late night arrival and his physical state when he arrived, although only Shipp saw blood on Scott.  Whether or not Scott was actually at their apartment on the night of the murder and, if he was, the time of his arrival, were material facts, as was the Westbrook's testimony about his physical state.

Fourth, Scott's counsel was allowed to extensively cross-examine Westbrook on a number of issues.  She admitted that, unlike her son, she saw no blood on Scott.  Doc. #19-4 at 145, PageID #3824.  She was also confronted with

inconsistency in her testimony regarding the amount of time Scott lived at the same apartment complex as her, stating that he had lived there for three years when Scott had actually only moved there nine months before the murder. *Id.* at 137-38, PageID #3816-17.  She was asked on direct examination about her convictions for marijuana trafficking and witness intimidation, and defense elicited more information about those convictions, as well as the fact that she had spent time in jail. *Id.* at 111 (direct) and 170 (cross-examination), PageID #3790, 3849.

Scott's attorney also raised the issue of the substantial delay in her cooperation, which was demonstrated by the fact that even after learning that Scott was a suspect, she never went to the police herself:

> Q.  Okay.  Yet, within two or three months . . . you find out he is a suspect?
>
> A.  Yep.
>
> Q.  But you still don't call the police?
>
> A.  Still don't call the police.
>
> Q,  Months go by, years, over a year goes by, you don't say anything, you don't do anything?
>
> A.  Sure don't.
>
> Q.  And you don't tell this story to the police until they knock on your door in December, 2005, 17 months after this incident occurred.  Isn't that a fact?
>
> A.  Seventeen months, yes.  I didn't talk to the police until Detective Scott Moore came and knocked on my door and asked me to tell him about that night.  That's what I did.

*Id.* at 159-60, PageID #3838-39.

21

Furthermore, in spite of the fact that her son, Shipp, corroborated parts of her testimony, Scott's counsel impeached him during cross-examination with a statement made to the police in December, 2005, that he had seen a report on the news about the murder, after Shipp testified that he had not been aware of the murder between May and December of that year. Doc. #19-5 at 53-54. The strength of Westbrook's testimony depended in part on Shipp's credibility, and vice versa, as each partially corroborated the other's version of events.

Westbrook's testimony stood in contrast to the grand jury testimony of John Jackson, which was read to the jury because he was unavailable to testify. Doc. #19-8 at 2, PageID #4616. Jackson testified that he and Scott had been in their apartment cooking on the grill and drinking on the night of Chad Stapleton's murder. *Id.* at 9-10. Jackson also testified that they heard sirens outside and had briefly left the apartment to see what was going on, but then returned to the apartment and went to sleep. *Id.* at 12, PageID #4625. Scott testified on his own behalf, and essentially described the evening as Jackson had, although he claimed that they did not leave the apartment until later than Jackson had stated. Doc. #19-8 at 96, PageID #4709.

In considering the effect that any further cross-examination would have had, it must be stressed that Scott could not have asked whether Westbrook had entered into a plea deal with the prosecution in exchange for her testimony, as a pre-trial evidentiary hearing determined that no such deal existed. The Ohio Court of Appeals held that Scott had no good faith basis for asking about any such deal.

22

Rather, the Ohio Court of Appeals described the cross-examination that Scott should have been allowed to perform as asking whether Westbrook had "subjectively hoped for favorable treatment [on her pending criminal charges] when she cooperated with police, which was relevant to bias, prejudice and motive." 2010-Ohio-1919 at ¶ 32.  Westbrook would have experienced any such "subjective hope" during her initial cooperation with police, seventeen months after the murder, in December, 2005.  Between that time and the commencement of Scott's trial, she received no deal based on her testimony against Scott, and her own criminal proceedings had been resolved.[3]  In Scott's Objections to the R&R, he argued that the jury should have been allowed to hear Westbrook's response to a question about whether she subjectively expected a deal when she spoke to police.  Doc. #27 at 3.

In addressing Scott's objection, the Magistrate Judge dismissed Scott's argument that the jury should have been allowed to hear what Westbrook would have said regarding her motivations, stating "he has no proof that she would have admitted a motivation to help the police in hope she would get a benefit with her

---

[3] In Scott's Objections to the Supplemental R&R, he criticized the testimony of Westbrook's prosecutor at the pre-trial hearing, who speculated on Westbrook's motives for pleading guilty in her drug trafficking case and stated that she would have received community control whether or not she went to trial.  Doc. #31 at 11-12.  The trial court determined that Westbrook did not receive a plea deal in exchange for her testimony, which it was entitled to do in order to rule on a preliminary question of admissibility under Ohio Evid. R. 104(a).  The Court presumes that finding to be correct in the absence of "clear and convincing evidence" to the contrary, which Scott has not provided.  22 U.S.C. § 2254(e)(1).

pending case." Doc. 29 at 3. However, Scott is not required to prove that Westbrook would have responded to the question one way or another. In *O'Neal*, the Supreme Court took pains to point out that it "deliberately phrase[d] the issue in this case in terms of a judge's grave doubt, instead of in terms of 'burden of proof.'" 513 U.S. at 436. The harmlessness review "does not involve a judge who shifts a 'burden' to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect." *Id.* The question is not what Westbrook would have actually answered in response to the cross-examination, but the effect that allowing to it occur would have had on the jury's verdict. *Van Arsdall*, 475 U.S. at 684; *Brecht*, 507 U.S. at 623. The Magistrate Judge further reasons that "[t]he most that Scott has is a hope that Westbrook would have changed her testimony from the *in limine* hearing and that hope is not enough to show that prohibiting the question was not harmless error." There is no doubt that catching Westbrook in an inconsistent statement would have been the ideal outcome for Scott, but, again, this analysis does not address the real issue: the effect of the cross-examination on the jury's perception of Westbrook's credibility.

Nevertheless, after considering the *Van Arsdall* factors set forth above, the Court does not believe that asking Westbrook about her subjective hope for a plea deal two and half years earlier would have had anything other than a *de minimis* effect on her credibility. As the Magistrate Judge noted, if Scott had been allowed

24

to ask the question, after Westbrook's answer, he would simply "have been stuck with her denial," because he had no evidence to rebut it.  Doc. #29 at 4.  Thus, the question is whether hearing that limited exchange, coupled with the jury's ability to examine Westbrook's credibility during her response, would have had a substantial and injurious effect on the jury's verdict.  Without any further evidence to impeach Westbrook's denial, the Court concludes that it would not have had such an effect.  As noted, Scott's attorney was allowed to cross-examine Westbrook on a number of other issues.  Perhaps most damaging was her inability to explain why she never contacted the police about Scott's appearance on the night that the murder occurred, even after finding out he was a suspect.  During all of those exchanges, the jury had ample opportunity to examine Westbrook's credibility, and ultimately chose to believe her.  The Court concludes that hearing one additional question about her subjective hope for plea deal several years before, coupled with a denial that Scott could not disprove, would not have damaged Westbrook's credibility enough to have had a substantial and injurious effect on the jury's verdict.

## B.    Testimony of Amy Rismiller

The Court now considers the trial court's prohibition on questioning Amy Rismiller, the State's serology expert, about her past discipline for contamination of DNA samples.  Before considering the *Van Arsdall* factors, the Court will briefly summarize Rismiller's testimony.

25

Rismiller testified that she had worked at the Miami Valley Regional Crime Lab for five and a half years, where she performed both serological and DNA analysis. Doc. #19-4 at 172, PageID #3851. She stated that she had "to go to yearly training, keep up to date usually on new DNA methods that come out," and that she had testified "in the field of serology or DNA" 24 times. *Id.* at 173-74, PageID #3852-53. After affirming that her "testimony [had] been accepted as expert in the field of forensic science serology and DNA," the trial court declared her an expert. *Id.*

Rismiller explained to the jury that serological analysis means the identification of bodily fluids. 19-4 at 175, PageID #3854. Her job was to identify the presence of bodily fluids on evidence, then send the sample to another forensic scientist for DNA testing. *Id.* at 176, PageID #3855. She did this by testing the evidence for the presence of a bodily fluid and preserving a sample of the fluid with a swab. *Id.* at 179, PageID #3858. This sometimes involved cutting pieces from clothing, as well as retaining swabs submitted from suspects or persons of interest. *Id.* 196-97, PageID #3875-76.

In her testimony, Rismiller stated that she did not perform any DNA analysis on the evidence in Scott's case. *Id.* She testified that when she performed serology work, she and the DNA analyst would work together, and she would visually identify where samples and stains came from, but would not perform the DNA analysis. *Id.* at 245-46, PageID #3924-25.

26

When Scott's attorney attempted to question Rismiller on the contamination of DNA samples, the prosecution objected. Doc. #19-4 at 218, Page ID#3897. Scott's attorney had an internal memorandum from Rismiller's lab that described contaminated samples.[4] *Id.*; *see* Doc. #19-1 at 239, PageID #2863. After reviewing the memorandum, the trial judge stated: "Well, well, this is not challenging her expertise. It's challenging her practice in the preserving and handling of evidence so it's not going to her qualifications as a witness." *Id.* at 218, PageID #3897. He described it as "a criticism with regard to DNA, not her qualifications in terms [of] being a DNA analyst and that doesn't address her expertise as a serologist and so I sustain the objection." *Id.* at 219-20, PageID #3898-99.

When the first *Van Arsdall* factor is considered, it is clear that Rismiller's testimony was important to the prosecution's case. She was in charge of the preparation of all of the samples that were tested for DNA. Her testimony established a crucial link in the chain of custody between the initial collection by the coroner and investigators and its preliminary analysis at the crime lab. She described how she processed each piece of evidence and preserved it for the DNA

---

[4] Scott attached a copy of this memorandum, along with other internal memoranda from the crime lab, to his Request for Reopening of Appeal Pursuant to Ohio App. R. 26(B), filed on July 29, 2010 (Doc. #9-1 at 210), which the State denied on January 26, 2011 (Doc. #9-1 at 294). In its decision, the Ohio Court of Appeals noted that "some of the documents on which he relies were not part of the trial court record. As such, they cannot form the basis of a reversal on direct appeal." *Id.* at 297. In its review of this issue, the Court confined its review to the statements made by the trial court judge when ruling on the objection, as quoted above, without reference to the memoranda that Scott attached to the motion.

analysis performed by Annette Davis. Davis confirmed that Rismiller had

submitted the samples that she analyzed. Doc. #19-10 at 46, PageID #5025.

Thus, Rismiller's testimony was not only important for its own sake, but as a

foundation for the Davis' expert testimony.

There was no other witness to corroborate or contradict Rismiller's

testimony, which also demonstrates her importance as a witness and her

credibility. On cross-examination, Scott's attorney asked Rismiller about the other

evidence collected from Scott's apartment, such as Scott's shoes, presumably to

emphasize the absence of blood or incriminating fluids on those items. The only

possible way of impeaching Rismiller's credibility, however, was restricted by the

trial court's ruling.

The Magistrate Judge and the Warden draw a distinction between Rismiller's

role as a serology expert and her role as a DNA analyst that was, perhaps, not as

clear in the context of her testimony and the trial. As Scott points out, Rismiller

was accepted as an expert in *both* fields at the beginning of her testimony. Her

testimony was not purely confined to serology matters. For example, she testified

about "wearer DNA" and how it is left behind on clothing by the sweat of the

person wearing it. Doc. #19-4 at 185, PageID #1864. She also testified that

when she performed serology work, she and the DNA analyst would work

together, and she would visually identify where samples and stains came from. *Id.*

at 245-46, PageID #3924-25.

28

If the jury had been allowed to hear cross-examination on the subject of Rismiller's past issues with what the trial court judge described as the "preserving and handling" of DNA evidence, it may have affected her credibility as a DNA expert and as a serologist. All of the work that she testified about doing involved the *preserving and handling* of evidence before giving it to the DNA analyst. There is also the possibility that, if cross-examination had damaged her credibility as a serologist, the effect would not have been confined to her testimony, because Rismiller laid the foundation for Davis' testimony about the DNA analysis performed on each sample. If the "damaging effect of the cross-examination were fully realized," the jury might have applied greater scrutiny to the DNA results as well, not just her handling of the pre-analyzed samples. *Van Arsdall*, 475 U.S. at 684. Thus, the Court does not agree with the conclusion that simply because Rismiller did not perform the DNA analysis used in Scott's case, the damaging effect of any cross-examination would not have affected the jury's consideration of the DNA evidence.[5]

However, the Court cannot conclude that the effect would have had a substantial or injurious effect on the jury's verdict. Scott admitted to several facts

---

[5] In the Supplemental R&R, the Magistrate Judge also stated that "Scott does not suggest any way in which [Rismiller's] problems with DNA in another case would have been relevant (i.e., would have made it less likely that it was Scott's DNA which was found) in this case." Doc. #29 at 3. The relevancy of the DNA evidence is not the issue. As with Westbrook, the substance of Scott's Confrontation Clause claim concerns the potentially damaging effect the line of questioning might have had on Rismiller's credibility.

that the prosecution used DNA evidence to prove. First, a saliva sample from the front of the victim's shirt contained Scott's DNA, but Scott did not dispute that it was his. Doc. #19-10 at 69, PageID #5049. Rather, he admitted to biting the victim on his chest through the shirt. Doc. #19-8 at 83, PageID #4696. Second, Scott's "wearer" DNA was found on the hat found near the scene of the crime and on the red t-shirt discovered outside of Westbrook's apartment. Scott admitted that both items belonged to him. *Id.* at 132, PageID #4745 (hat); Doc. #139, PageID #4752 (t-shirt). Blood on Scott's red t-shirt matched the victim, but only Scott's DNA was found on the hat. Doc. #19-10 at 58, 65, PageID #5038, 5044. Thus, apart from the victim's blood found on Scott's shirt, Scott's own testimony corroborated much of the DNA evidence admitted against him.

Furthermore, Scott's attorney did not make a chain of evidence argument challenging the actual handling of the evidence against him, as his objection only sought to impeach Rismiller's credibility. However, even if Scott's attorney had been allowed to question Rismiller about her disciplinary history for DNA contamination, the prosecution undoubtedly would have pointed out that she performed none of the DNA analysis in Scott's case. This rehabilitation would have mitigated the damaging effect of the cross-examination. The jury was already aware that contamination at the lab had occurred in the past, as Scott's attorney elicited that information when he cross-examined Davis, the DNA analyst. Doc. #19-10 at 71 at 9050. On re-direct examination, Davis stated that there was no contamination in Scott's case, and that the results went through a technical

review process. *Id.* at #19-18 at 90, PageID #5069. Thus, much of the substance of the cross-examination that Scott argues he should have been allowed to conduct against Rismiller played out during the testimony and cross-examination of Davis. Based on the foregoing *Van Arsdall* factors, the Court cannot conclude that the hypothetical cross-examination of Rismiller would have had a substantial or injurious effect on the jury's verdict.

### C.    The Overall Strength of the Case Against Scott

The final *Van Arsdall* factor to consider is "the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684. The Magistrate Judge agreed with the Ohio Court of Appeals' statement regarding the strength of the prosecution's case against Scott, and quoted the following analysis of that court:

> Although we have concluded that the trial court unduly restricted the cross-examination of Westbrook and Rismiller, on the whole, the evidence against Scott was quite strong. His DNA and the victim's blood were found on a red t-shirt discarded in Scott's apartment complex. Scott claimed that he had left this t-shirt on his patio, where it could have been stolen, because it was moldy, but the DNA analyst testified that there was no mold on the t-shirt. Scott's saliva was also found on Stapleton's shirt. A knife that matched a set at Scott's apartment was found at the murder scene. Westbrook and her son testified that Scott came to their apartment around the time of the murder, breathless and sweaty, and asked for a new shirt. According to the son, Scott was also covered in blood. A short time later, when the police responded to the scene, Scott suddenly disappeared while walking in the apartment complex with Westbrook. Due to the strength of this evidence, the errors in limiting cross-examination were harmless beyond a reasonable doubt, and Scott was not unfairly prejudiced by the trial court's limitations on his cross-examination.

2010-Ohio-1919 at ¶ 43.

To some extent, the strength of the evidence in this description is premised on the reliability of Westbrook's testimony and the DNA evidence against Scott, both of which Scott was restricted from attacking on the specific grounds that give rise to his Confrontation Clause claim. When a court determines that the overall strength of the prosecutor's case justifies a finding of harmlessness, and the claim or appeal is based on an unconstitutional restriction on the right to attack the credibility of the witnesses who presented the evidence that, itself, is the strong evidence against the defendant, there is a risk of indulging in circular reasoning that fails to account for the potential damage that the cross-examination could have wrought upon the prosecution's case. With this note of caution in mind, the Court turns to the consideration of the strength of the prosecution's case against Scott.

For several reasons, the prosecution's evidence was not as unequivocally strong as the Court of Appeals suggests. For example, the knife used to stab Stapleton came from a three-piece set sold as a unit at Dollar General stores, and the two other types of knife sold in the set were found at Scott's apartment. It was not established that the murder weapon was from the *same* set of knives found in Scott's apartment.[6] The State's witness from the knife distributor acknowledged that the company sells 175,000 to 190,000 sets of the knives each

---

[6] Scott claimed he had bought individual knives at a flea market, and had never purchased a set at Dollar General. Doc. #19-8 at 63-64, PageID #4676-77.

32

year, including the year of Stapleton's murder, at over 8,000 Dollar General stores nationwide. Doc. #19-3 at 519, PageID #3632.

More importantly, the Court of Appeals' summation of the evidence did not acknowledge the testimony of several witnesses who stated that, immediately after hearing Stapleton's screaming, they saw a man facing him and holding him against the brick wall of the parking lot who was not Scott. Mara Jones, Stapleton's girlfriend, described the man as a thin white male between 5'9 and 5'10, in his late twenties, with very short brown hair. Doc. #19-4 at 21, PageID #3700. Tommy Evans, a neighbor, came out of his apartment after he heard loud voices, saw two white males near the dumpster, and recognized one of them as Chad Stapleton. Doc. #9-4 at 102-03, PageID #1428-29. He described the other white male as being 5'10", 140 pounds, with short hair, wearing a red shirt and blue jeans, and standing with his hands up in front of Stapleton. *Id.* at 105, PageID #1431. When Evans approached, the white male looked at him and "then took off," running across the street towards Cobblegate, the apartment complex where Scott lived. *Id.* at 106-07, PageID #1432-33. After the police arrived, Evans again saw the white male, still wearing the red shirt, in the passenger seat of a car that drove by. *Id.* at 109-10, PageID #1435-36. Tammy Evans, Tommy's mother, also saw someone in a red shirt running across the street towards the Cobblegate apartment complex, but could not otherwise describe the person. Doc. #9-4 at 84-85, PageID #1410-11. On cross-examination, she remembered that she had described the person to the police as a man with very short hair. Id. at

94, PageID #1420.  At the time of Stapleton's murder, Scott was a bald, 40 year old dark-skinned African-American of 5'6"-5'7" in height, who weighed 180 pounds.

Scott also points out that before investigators found Westbrook, the State had unsuccessfully attempted to obtain an indictment against him with the evidence it had, including the DNA evidence.  Doc. #31 at 11; *see also* Doc. #19-1 at 37, PageID #2661 (noting Scott's release from jail on July, 28, 2004, after the first grand jury did not indict Scott, set forth in the Finding of Facts of the Decision and Entry Sustaining in Part and Overruling in Part Def.'s Mot. to Suppress).  Only with the addition of Westbrook's testimony was the State able to indict Scott. While the Court agrees that this fact demonstrates how crucial Westbrook's testimony was to the prosecution's case, it does not believe that it detracts from the strength of the case that the prosecution mounted against Scott.  In the end, the jury believed Westbrook's testimony, even with the damage that Scott's attorney was able to inflict on cross-examination.  As explained previously in Section II.A., the Court does not believe that one additional cross-examination question regarding her subjective motivation to cooperate with police would have functioned as the proverbial "straw that broke the camel's back," and irredeemably damaged Westbrook's credibility with the jury.  While the Court is not in complete agreement with the Magistrate Judge and the Court of Appeals regarding the strength of the prosecution's case, it also does not agree with Scott's

characterization of the evidence against him as a nothing more than a house of cards that wholly relied on Westbrook's testimony for its strength.

The fact remains that key physical evidence connected Scott to the crime scene, including his hat and his saliva on victim's shirt. Across the street, the police found Scott's shirt, spattered with the victim's blood, in his apartment complex. This, in connection with the other evidence presented to the jury, was sufficient for it to convict Scott beyond a reasonable doubt for Stapleton's murder, in spite of the unexplained appearance of the man who was not Scott that witnesses saw with the victim immediately after the stabbing. Even when considering the strength of the prosecution's case, which, as discussed, the Court believes is not quite as strong as the Magistrate Judge and the Court of Appeals suggest, the Court remains convinced that the restrictions on Scott's ability to cross-examine Westbrook and Rismiller did not have substantial and injurious effect on the jury's verdict. Thus, the Court is not left with the "grave doubt" that *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995), requires to grant a writ of habeas corpus. Accordingly, Scott's Petition is denied. Nevertheless, because acknowledged errors at trial occurred, and because reasonable jurists might come to a different conclusion as to the effect those errors had on the jury, the Court grants Scott a certificate of appealability on Ground One of his Petition.

### III.    CONCLUSION

For the reasons set forth above, the Court ADOPTS the R&R (Doc. #25) and the Supplemental R&R (Doc. #29) of the Magistrate Judge, and OVERRULES Scott's Objections (Doc. #27 and Doc. #31) thereto.  Scott's Petition (Doc. #2) is DENIED, and all grounds for relief set forth therein are DISMISSED WITH PREJUDICE.

Scott has not made a substantial showing of the denial of a constitutional right on Grounds Two, Three, Four, Five or Six of the Petition.  Because the Court's decision thereon would not be debatable among reasonable jurists, and because any appeal from this Court's decision would be objectively frivolous, Scott is DENIED a certificate of appealability, and he is DENIED any anticipated motion for leave to appeal *in forma pauperis* on Grounds Two through Six.

However, for the reasons set forth above, the Court GRANTS Scott a certificate of appealability on Ground One of the Petition, in which Scott argues that violation of his rights under the Confrontation Clause of the Sixth Amendment and the Due Process Clause under the Fourteenth Amendment had a substantial and injurious effect on the jury's verdict, based upon the trial court's restriction on his ability to cross-examine Lona Westbrook and Amy Rismiller at trial.

Judgment is to enter in favor of Respondent and against Petitioner herein, dismissing Petitioner's Petition for a Writ of Habeas Corpus (Doc. #2) on all Six

Grounds, and granting Petitioner a Certificate of Appealability on Count One only, along with permission to appeal *in forma pauperis* on that count only.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: October 21, 2014

WALTER H. RICE
UNITED STATES DISTRICT JUDGE